1  Mitchell F. Boomer (State Bar No. 121441)
   Scott P. Jang (State Bar No. 260191)
2  Yuki Cruse (State Bar No. 310073)
   JACKSON LEWIS P.C.
3  50 California Street, 9th Floor
   San Francisco, California 94111-4615
4  Telephone:  (415) 394-9400
   Facsimile:  (415) 394-9401
5  E-mail:  Mitchell.Boomer@jacksonlewis.com
   E-mail:  Scott.Jang@jacksonlewis.com
6  E-mail:  Yuki.Cruse@jacksonlewis.com

7  Attorneys for Defendant
   APPLE INC.

8

9              UNITED STATES DISTRICT COURT

10           NORTHERN DISTRICT OF CALIFORNIA

11

12  JOSH AREBALO,                        Case No. 5:19-cv-03034-EJD

13          Plaintiff,                   **DEFENDANT'S MOTION FOR
                                         SUMMARY JUDGMENT**
14      v.
                                         Date:       May 6, 2021
15  APPLE, INC.; a California Corporation; and   Time:       9:00 a.m.
    DOES 1 through 10, inclusive,        Judge:      Edward J. Davila
16                                       Courtroom:  4
            Defendants.
17                                       Complaint Filed:  May 31, 2019
                                         Trial Date:       None Set
18

19                   <u>**NOTICE OF MOTION**</u>

20  TO THE HONORABLE COURT AND PLAINTIFF (PROCEEDING PRO SE):

21          PLEASE TAKE NOTICE THAT on May 6, 2021 at 9:00 a.m. in Courtroom 4, or as soon

22  as can be heard thereafter, before U.S. District Judge Edward J. Davila of the above-entitled Court,

23  located at 280 South 1st Street, San Jose, CA 95113, Defendant Apple Inc. ("Apple") will move

24  this Court for an order granting summary judgment in its favor against Plaintiff Josh Arebalo

25  ("Plaintiff") pursuant to Federal Rule of Civil Procedure 56.

26          Apple moves the Court for an order granting Apple's summary judgment pursuant to Rule

27  56 on all of Plaintiff's causes of action in this case: (1) disability discrimination in violation of the

28  Americans with Disabilities Act; and (2) wrongful termination in violation of California public

1    policy.  No genuine dispute of fact exists with respect to any of Plaintiff's causes of action.  This

2    motion is based on the Notice of Motion; the following Memorandum of Points and Authorities;

3    the supporting declarations of David Pratt, Justin Bishop, and Scott Jang; the arguments presented

4    at oral argument; and any other argument or evidence that the Court may properly consider.

5

6    Dated:  February 1, 2021                          JACKSON LEWIS P.C.

7

8                                                By:    /s/ Scott P. Jang
                                                       Mitchell F. Boomer
9                                                      Scott P. Jang
                                                       Yuki Cruse
10                                                     Attorneys for Defendant
                                                       APPLE INC.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

I.     STATEMENT OF ISSUES TO BE DECIDED ........................................................1

II.    INTRODUCTION ...............................................................................................1

III.   STATEMENT OF UNDISPUTED FACTS ........................................................3

    A.     Plaintiff's Job at Apple.............................................................................3

    B.     Plaintiff's Performance and Termination..................................................4

        1.     Plaintiff Reports to David Pratt in February 2017. .......................4

        2.     Pratt Coaches Plaintiff on Performance Gaps in April 2017. .....................4

        3.     Pratt Alerts Plaintiff to a Technical Role Opening in May 2017................5

        4.     Pratt Completes Plaintiff's Annual Performance Review in June 2017........................................................................................................6

        5.     Pratt Delivers an Action Plan to Plaintiff in July 2017............................7

        6.     Plaintiff Receives a Misconduct Warning in September 2017. ..................7

        7.     Plaintiff is Placed on a Documented Coaching Plan in November 2017........................................................................................................9

        8.     Plaintiff Falls Short in His Documented Coaching and is Terminated in December 2017. ......................................................................10

    C.     Plaintiff's Alleged Carpal Tunnel and Stretch Breaks...........................13

    D.     Plaintiff's Alleged Two Meetings with Bishop About Employee Concerns. ........14

    E.     Plaintiff's Current Lawsuit.....................................................................14

IV.   ARGUMENT .....................................................................................................14

    A.     Summary Judgment Standard. ................................................................14

    B.     Plaintiff's First Cause of Action under the ADA Fails as a Matter of Law..........15

        1.     The Failure to Accommodate Theory of Liability Fails. ..........................15

        2.     The Disability Discrimination Theory of Liability Fails. .........................17

            a.     Plaintiff Cannot Show a *Prima Facie* Claim. ................................17

            b.     Plaintiff Cannot Prove Pretext for Disability Discrimination.........19

        3.     The Retaliation Theory of Liability Fails..................................................20

            a.     The Moving Misconduct ..............................................................21

1

b.      The Alleged Concerns About Employee Health to Bishop ...........21

2      C.      Plaintiff's Second Cause of Action for Wrongful Termination in Violation
        of *California* Public Policy Fails as A Matter of Law. ...........................................23

3

V.      CONCLUSION .............................................................................................................25

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT                    Case No. 5:19-CV-03034-EJD

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Arteaga v. Brink's, Inc.*,
  163 Cal. App. 4th 327 (2008)..................................................................................................18

*Brown v. City of Tucson*,
  336 F.3d 1181 (9th Cir. 2003).................................................................................................20

*Campbell v. Arco Marine, Inc.*,
  42 Cal. App. 4th 1850 (1996)..................................................................................................24

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986).................................................................................................................14

*FTC v. Stefanchik*,
  559 F.3d 924 (9th Cir. 2009)...................................................................................................15

*Godwin v. Hunt Wesson Inc.*,
  150 F.3d 1217 (9th Cir. 1998)............................................................................................17, 20

*Gonsalves v. Infosys Techs., Ltd.*,
  No. 09-04112 MHP, 2010 U.S. Dist. LEXIS 44401 (N.D. Cal. May 6, 2010) ........................24

*Hanson, Hanson v. Lucky Stores, Inc.*,
  74 Cal. App. 4th 215 (2009).....................................................................................................24

*Kadiyan v. Medtronic*,
  No. CV 10-05921 MMM, 2011 U.S. Dist. LEXIS 163991 (C.D. Cal. Apr. 8,
  2011), *aff'd* 510 Fed. Appx. 649 (9th Cir. 2013) ....................................................................18

*Merrick v. Farmers Ins. Group*,
  892 F.2d 1434 (9th Cir. 1990)..................................................................................................22

*Nissan Fire & Marine Insurance Co., Ltd. v. Fritz Cos., Inc.*,
  210 F.3d 1099 (9th Cir. 2000)..................................................................................................15

*North Alaska Salmon Co. v. Pillsbury*,
  174 Cal. 1 (1916) .....................................................................................................................23

*Nunes v. Wal-Mart Stores, Inc.*,
  164 F.3d 1243 (9th Cir. 1999)..................................................................................................17

*O'Connor v. Uber Technologies, Inc.*,
  58 F. Supp. 3d 989 (2014).........................................................................................................23

*Smith v. Firestone Tire and Rubber Co.*
  875 F.2d 1325 (7th Cir. 1989)................................................................23

*Soremekun v. Thrifty Payless, Inc.*,
  509 F.3d 978 (9th Cir. 2007)................................................................15

*Stegall v. Citadel Broad. Co.*,
  350 F.3d 1061 (9th Cir. 2003)..........................................................21, 23

*Sullivan v. Oracle Corp.*,
  51 Cal. 4th 1191 (2011) ......................................................................24

*Thrifty Oil Co. v. Bank of America Nat. Trust & Savings Association*,
  322 F.3d 1039 (9th Cir. 2003)................................................................15

*Wallis v. J.R. Simplot, Co.*,
  26 F.3d 885 (9th Cir. 1994)..................................................................20

*Zivkovic v. S. Cal. Edison Co.*,
  302 F.3d 1080 (9th Cir. 2002)..........................................................15, 16

**Statutes**

42 U.S.C. § 2000e-5(e)(1)......................................................................16

42 U.S.C. § 12112 (b)(5)(A) ...................................................................15

42 U.S.C. § 12117(a) ............................................................................16

42 U.S.C. § 12203(a) ........................................................................20, 21

Americans with Disabilities Act ................................................... *passim*

California's Fair Employment and Housing Act ....................................23, 24

**Other Authorities**

29 C.F.R. § 1630.9(a)............................................................................15

Fed. R. Civ. P. 56.................................................................................1

Fed. R. Civ. P. 56(a).............................................................................14

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      STATEMENT OF ISSUES TO BE DECIDED**

Apple moves the Court for an order granting Apple's summary judgment pursuant to Rule 56 on all of Plaintiff's causes of action in this case: (1) disability discrimination in violation of the Americans with Disabilities Act; and (2) wrongful termination in violation of public policy.

**II.     INTRODUCTION**

Apple terminated Plaintiff's employment based on his well-documented performance deficiencies in his essential duties as a manager.  Indeed, when Plaintiff's annual performance review during the relevant 2017 time period detailed these performance deficiencies and gave him an "expected more" rating (*i.e.*, the lowest rating) regarding his results, Plaintiff wrote: "I agree completely here!"

The performance gaps and deficiencies that resulted in Plaintiff's termination extend back as early as April 2017 and span a period of more than seven months.  In April 2017, Plaintiff's direct manager David Pratt ("Pratt") identified gaps in Plaintiff's performance regarding coaching his direct reports.  Plaintiff failed to conduct coaching sessions with his direct reports and failed to upload the notes from those sessions in a timely manner – and sometimes failed to upload his notes at all.  Both tasks were core duties for Plaintiff as a team manager.  Coaching sessions ensured that direct reports received consistent performance feedback, while uploading notes (1) confirmed that the required coaching sessions timely occurred; and (2) provided a clear, objective record of direct reports' development for use in performance evaluations.

Over the next seven months, Pratt coached Plaintiff on this and other issues.  But Plaintiff's performance continued to falter.  Plaintiff repeatedly missed deadlines, made oversights and errors in his work, and at times still failed to upload his coaching session notes to Apple's document portal on time.  This was despite Plaintiff receiving informal and formal coaching through three separate performance documents: (1) Plaintiff's 2017 Annual Performance Review; (2) an Action Plan; and (3) a formal Documented Coaching Plan.  After Plaintiff failed to improve his performance to meet the Documented Coaching Plan – which included, among other things, an error by Plaintiff during the Documented Coaching period causing employees to be underpaid – Pratt decided to terminate

1

1    Plaintiff's employment in December 2017.

2          Despite this well-documented history chronicling his performance deficiencies, Plaintiff

3    now alleges that he had a carpal tunnel condition and Apple: (1) failed to accommodate his carpal

4    tunnel; (2) discriminated against him by terminating his employment because of his carpal tunnel;

5    and (3) retaliated against him by terminating his employment after he complained about disability

6    discrimination.  The claims fail.

7          *First*, with respect to accommodation, the only document that even arguably shows Plaintiff

8    requesting an accommodation from Pratt is a July 2017 email exchange between Plaintiff and Pratt

9    wherein Plaintiff states that his "hands were not well" due to his moving trip to Washington that

10   weekend.  In response, Pratt approved Plaintiff taking time off and suggested that Plaintiff reach

11   out to Apple's third-party leave administrator about intermittent leave.  This is evidence that Apple

12   accommodated Plaintiff, not that it failed to do so or that it had any disability animus.

13         Plaintiff attempts to counter this undisputed fact by asserting – without any documentary

14   evidence – that around this same time in July 2017, Pratt allegedly reviewed Plaintiff's calendar

15   over videoconference, told Plaintiff that he could not take short five-minute stretch breaks during

16   the day, and instructed Plaintiff to remove the breaks from his calendar.  The assertion is specious

17   for numerous reasons, including: (1) Plaintiff was a remote, exempt employee who determined his

18   own schedule; (2) in deposition, Plaintiff's recollection of the event was remarkably hazy, and he

19   could not recall basic details about the event (*e.g.*, What did the breaks look like on the calendar?

20   What did Pratt say?); and (3) this stands in sharp contrast to the contemporaneous, ***documented***

21   accommodation discussed above, where Pratt readily showed his willingness to grant Plaintiff far

22   more burdensome accommodations (*i.e.,* time off and leave) for his hands.  But setting aside these

23   factual issues, the claim nevertheless fails as a matter of law because Plaintiff did not timely file a

24   charge regarding this matter with the U.S. Equal Employment Opportunity Commission ("EEOC").

25         *Second*, with respect to disability discrimination, Plaintiff cannot prove causation between

26   his carpal tunnel and his termination.  In deposition, Plaintiff asserted that his discussions with Pratt

27   about carpal tunnel were essentially confined to the July 2017 timeframe.  But by that point, Pratt

28   had already identified deficiencies in Plaintiff's performance and began coaching Plaintiff on these

deficiencies, as documented by Plaintiff's June 2017 Annual Performance Review.  There is also no evidence, let alone "specific" and "substantial" evidence, that Plaintiff's mentioning his alleged carpal tunnel in July 2017 motivated Pratt's decision to terminate Plaintiff's employment *four or five months later*.  To reach that conclusion, one must simply ignore the performance gaps and two performance documents within those months.

*Third*, with respect to retaliation, Plaintiff's claim hangs on two alleged meetings with his second-line manager Justin Bishop ("Bishop") in August/September and November 2017.  Plaintiff asserts that during those two meetings he mentioned the need for employees to take stretch breaks and that employees were considering writing a letter to Apple's Chief Executive Officer about workplace health concerns.  Plaintiff further asserts that at one point during the November 2017 meeting Bishop said, "I don't need this shit."

But even assuming this is true, the alleged comment constitutes nothing more than a single off-the-cuff remark that cannot support a retaliation claim.  In his deposition, Plaintiff revealed the full context of Bishop's alleged comment when he admitted that the two subsequently had a "good dialogue" and set a plan to address the issues raised by Plaintiff.  Moreover, and more critically, Pratt never even learned about Plaintiff's alleged meetings with Bishop, neither before nor after he decided to terminate Plaintiff's employment.  Thus, Plaintiff cannot establish a causal link between anything Bishop allegedly said and his termination.

In sum, Plaintiff's claims fail as a matter of law, and summary judgment is warranted.

## III.   STATEMENT OF UNDISPUTED FACTS

### A.   Plaintiff's Job at Apple.

Plaintiff worked for Apple from October 2012 to December 2017.  (Declaration of Scott P. Jang in Support of Apple's Motion for Summary Judgment ("Jang Decl."), ¶ 2, Ex. A, Deposition of Plaintiff ("Pl. Depo."), Vol. I, at 44:15-17; 229:5-12; Ex. 27.)  Beginning in 2015, Plaintiff worked as an At-Home Advisor Team Manager and managed a team of At-Home Advisors.[1]  (*Id.* at 46:2-12; Declaration of David Pratt ("Pratt Decl.") ¶ 4.)  Plaintiff's managerial duties included,

---

[1] At-Home Advisors are remote employees who help respond to customer questions about various Apple products via phone or through internet chat.  (Pl. Depo. at 45:3-4, 50:23-25.)

1  among other things: (1) regularly conducting coaching sessions with each direct report; (2)

2  documenting the coaching sessions and uploading the notes to Apple's document portal; (3)

3  reviewing direct reports' performance metrics and customer feedback; (4) reviewing direct reports'

4  timecards for completion and accuracy; (5) submitting direct reports' timecards to payroll for

5  payment of wages; and (6) disciplining direct reports where appropriate. (*Id.* at 48:9-12, 53:18-25,

6  54:12-20, 57:13-16, 61:17-20, 67:7-15, 68:11-18; Pratt Decl. ¶ 4.) Plaintiff was a remote, exempt

7  employee, who generally determined his own work hours. (*Id.* at 75:2-13; Pratt Decl. ¶ 5.)

8        **B.**    **Plaintiff's Performance and Termination.**

9        **1.**    **Plaintiff Reports to David Pratt in February 2017.**

10      Starting in February 2017, Plaintiff reported directly to Area Manager David Pratt. (Pratt

11  Decl. ¶ 4.) Pratt lived and worked remotely from Texas. (*Id.* ¶ 3.) Plaintiff joined Pratt's team and

12  became Pratt's direct report in February 2017, as part of a rebalancing of team managers amongst

13  area managers to ensure generally equal-sized teams. (*See* Jang Decl. ¶ 4, Ex. C, Deposition of

14  David Pratt ("Pratt Depo.") at 23:2-9.) Plaintiff had also previously worked under Pratt for a period

15  in 2015. (Pratt Decl. ¶ 4.)

16        **2.**    **Pratt Coaches Plaintiff on Performance Gaps in April 2017.**

17      As early as April 2017, Pratt observed gaps in Plaintiff's performance. (*Id.* ¶ 6; Pratt Depo.

18  at 38:11-22.) Of specific concern to Pratt, it appeared Plaintiff was not conducting one-on-one

19  coaching sessions with his direct reports, which was an essential part of Plaintiff's job duties as a

20  Team Manager. (Pratt Decl. ¶ 7.)

21      After discussing the issue with Plaintiff in their regular one-on-one meetings, Pratt learned

22  that (1) at times, Plaintiff was in fact not conducting the coaching sessions with his direct reports;

23  and (2) at other times, it simply appeared that Plaintiff had not conducted the coaching sessions

24  because he was not timely drafting and uploading his coaching session notes to Apple's system as

25  he was required to do. (Pratt Decl. ¶ 8; Pratt Depo. at 36:7-10; 43:11-21.) Rather than drafting and

26  uploading his notes to Apple's system immediately after completing the coaching session (or even

27  a few days later), Plaintiff habitually drafted and uploaded his notes in mass at the end of the month.

28  (Pratt Decl. ¶ 9; Pratt Depo. at 42:10-16; Pl. Depo., Vol. I, at 163:18-21.) In both situations,

Plaintiff failed to perform key job functions of his role as a Team Manager.  (Pratt Decl. ¶ 10.)

Coaching sessions ensured that direct reports received consistent performance feedback, while

uploading notes (1) confirmed that the required coaching sessions timely occurred; and (2) provided

a clear, objective record of direct reports' development for use in performance evaluations.  (*Id.*)

Plaintiff's inconsistency in performing these important job functions spanned over a period

of two years.  In 2015, Pratt observed similar performance deficiencies by Plaintiff and coached

him on the matter.  (Pratt Decl. ¶ 11; Pl. Depo., Vol. I, Ex. 17.)  As documented in Plaintiff's 2015

Annual Performance Review ("APR"), Pratt worked with Plaintiff on managing the workflow of

the coaching sessions to ensure Plaintiff had sufficient time to complete them during the month.

(*See* Pratt Decl. ¶ 12; Pratt Depo., Ex. 17 at JA043.)  Similarly, in 2016, Plaintiff's then-manager,

Sherry Gonzalez, noted similar deficiencies in Plaintiff's coaching documentation:

> Capturing accurate and complete documentation of conversations is important to
> ensure we are keeping detailed records for each employee.  Any conversation around
> performance, conduct or HR related must be accurately recorded in GBI or personal
> notes.  In a case when we need to pursue further action these documents are needed
> as supporting materials.  These changes should be implemented immediately and be
> maintained ongoing . . . During Q1 I would like for you to meet with a peer and gain
> best practices around workflow.  I would also suggest you meet with our GPS coach
> to gain additional techniques.

(Pratt Decl. ¶ 13; Pratt Depo., Ex. 42 at APL-AREBALO 109.)

Just as he did in 2015, Pratt discussed the issue with Plaintiff and coached Plaintiff on ways

to improve during their regular one-on-one meetings.  (Pratt Decl. ¶ 14; Pratt Depo. at 26:3-5; 38:1-

4.)  These coaching discussions started as early as April 2017 and continued during the subsequent

months.  (Pratt Decl. ¶ 14.)

### 3.   Pratt Alerts Plaintiff to a Technical Role Opening in May 2017.

Senior Area Manager Justin Bishop was Pratt's direct manager and Plaintiff's second-line

manager.  (Declaration of Justin Bishop ("Bishop Decl.") ¶ 3.)  On May 18, 2017, Bishop alerted

Pratt and other managers who reported to him that the "Carpe Facto" team was looking for a team

manager with technical aptitude.  (Pratt Decl. ¶ 15; Pratt Depo., Ex. 18.)  Pratt viewed Plaintiff as

one of his more technical-minded team managers and inquired whether Plaintiff was interested in

the role.  (Pratt Decl. ¶ 16; Pratt Depo. at 47:18-24.)  Although Pratt believed Plaintiff had shown

performance issues recently, Pratt thought he might be interested in the more technical role, which involved a different skill set.  (Pratt Decl. ¶ 17.)  Pratt did not have any decision-making role with respect to the Carpe Facto team, and his knowledge of the role and its requirements was limited to Bishop's email.  (*Id.* ¶ 18.)  Plaintiff did not apply for the role.  (Pl. Depo., Vol. I, at 158:25-159:2.)

### 4. Pratt Completes Plaintiff's Annual Performance Review in June 2017.

Pratt drafted Plaintiff's 2017 APR in June 2017 and completed the document by June 22, 2017.  (Pratt Decl. ¶ 19, Ex. 4; Pratt Depo. at 52:2-8.)  Pratt rated Plaintiff "Achieved expectations" in both teamwork and innovation.  (Pratt Decl. ¶ 20; Pratt Depo., Ex. 19.)  However, with respect to "Results," Pratt rated Plaintiff an "Expected more."  (Pratt Decl. ¶ 21; Pratt Depo., Ex. 19 at JA050.)  In the APR, Pratt provided specific examples of Plaintiff failing to meet expectations with respect to "Results," including:

- Documentation for coaching sessions or check ins have not been consistently loaded into GBI in a timely fashion. After Sherry addressed this in your previous APR and the Q1 QPR, you had shown improvement in Q2. However, in Q3, your coaching documentation was again not completed in a timely fashion. ***27.1% of your GBI documentation were entered on the last day of the periods.***

- Missed the expectation for SGT completion in three of the fiscal periods, P03, P06, and P08.

- Failed to document Team Meeting Minutes in a timely fashion for P05 and P08.

- Handoff email to peers has been lacking.  Key information about advisors, such as KinCare, attendance warnings, current action plans, etc. are needed by the receiving manager.

- Missed deadline for providing the Team Meeting spreadsheet to scheduling.

- Missed deadline to complete the ASM audit and provided inaccurate information about KinCare. (Submitted on 05/18, due 5/05).

(Pratt Depo., Ex 19 at JA051.)  (emphasis added).

Pratt's main concern was that Plaintiff was not managing his workflow and was not giving himself enough time to complete his tasks in a timely fashion.  (Pratt Decl. ¶ 23.)  As stressed above, Pratt noted that 27.1% of Plaintiff's coaching notes were entered ***on the very last day***.  (Pratt Depo., Ex. 19 at JA051.)  Pratt provided specific feedback on his expectations regarding Plaintiff's missed deadlines and workflow management issues:

I would like to see you place more priority and emphasis on your primary [Team

Manager] responsibilities. Keeping up with email communications, deadlines, projects, etc. are of high importance so as not to cause a negative ripple effect across your peers and organization. Staying up to date on important information and process helps us create a unified experience for our Advisors and customers. **There have been numerous deadlines missed and incomplete work submitted throughout the review period.** Specific examples include Performance Trackers used in your [one-on-one] discussions with Area Managers, your self-assessment for the [APR], and hand-off emails for other [Team Managers]. Reliability and trust in peers is crucial to having a successful Org at Apple. It's important that each person contributes what's needed and supports one another.

(*Id.* at JA052) (emphasis added).

Pratt delivered the 2017 APR to Plaintiff in July 2017.  (Pratt Decl. ¶ 26; Pl. Depo., Vol. I, at 160:14-18, Ex. 19.)  Plaintiff fully agreed with Pratt's assessment, as documented in the review itself where Plaintiff wrote: "***I agree completely here!*** I am looking forward to continuing to grow under your leadership, David."  (*Id.* at Ex. 19 at JA053) (emphasis added).

### 5.   Pratt Delivers an Action Plan to Plaintiff in July 2017.

When an employee receives an "expected more" rating in an annual performance review, the employee's manager is expected to provide direct coaching to the employee to improve their performance.  (Pratt Decl. ¶ 27.)  Accordingly, on or around July 12, 2017, Pratt and Plaintiff met in a one-on-one meeting to discuss an "Action Plan" that identified ways to help Plaintiff address the observed performance issues.  (Pratt Decl. ¶ 28; Pl. Depo., Vol. I, at 173:23-174:4, Ex. 20.)  The Action Plan outlined the performance issues, including Plaintiff's continued failure to timely complete and upload his coaching session notes, and created a plan for addressing the issues.  (Pratt Decl. ¶ 29; Pl. Depo., Vol. I, Ex. 20.)  The Action Plan focused particularly on Plaintiff's workflow management.  (Pratt Decl. ¶ 30.)  Based on Pratt's review of Plaintiff's performance, he felt Plaintiff had difficulty prioritizing his core job duties.  (*Id.* ¶ 31.)  The Action Plan therefore focused on ensuring Plaintiff allotted himself sufficient time to complete his core job duties without being interrupted by others.  (*Id.* ¶ 32; *see* Pl. Depo., Vol. I, Ex. 20 at APL-AREBALO 82.)  The Action Plan was scheduled to last until September 4, 2017, with the possibility of extension.  (Pratt Decl. ¶ 33; Pl. Depo., Vol. I, Ex. 20 at APL-AREBALO 82.)

### 6.   Plaintiff Receives a Misconduct Warning in September 2017.

Per Apple policy, At-Home Advisor Team Managers are required to inform their managers

about any move of their home office location.  (Pl. Depo., Vol. I, at 94:16-20, Pratt Decl. ¶ 34, Ex. 8.)  This is because a remote employee's pay scale corresponds with their location.  (Pratt Decl. ¶ 35; Pl. Depo., Vol. I, at 135:15-19.)  Employees who work in metropolitan areas with a higher cost of living fall under a higher pay scale.  (Pratt Decl. ¶ 36.)

Plaintiff understood this guideline, and on April 29, 2017 informed Pratt that he would be moving from the "~~expensive~~ state of California . . . to the Pacific Northwest."  (Pl. Depo. Vol. I, at 134:22-135:4, Ex. 12 (strikeout in the original).)  Plaintiff specifically informed Pratt that he was considering moving to Ocean Shores, Washington.  (Pratt Decl. ¶ 37, Ex. 9; Pl. Depo., Vol. I, Ex. 13 at APL-AREBALO 392.)  Pratt responded by congratulating Plaintiff on his move and informing Plaintiff that, because Plaintiff was moving outside a Major Market pay scale location, his salary would be reduced. (Pl. Depo., Vol. I, Ex. 13 at APL-AREBALO 392.)  Pratt asked Plaintiff to confirm his move to Ocean Shores so that he could enter the new address in Apple's human resources system.  (*Id.*)

In response to Pratt indicating a potential drop in pay, Plaintiff then suggested that he was considering moving to Federal Way, Washington, which is within the Seattle Metropolitan area. (*Id.* at APL-AREBALO 391.)  Pratt replied that Federal Way was considered a Major Market and therefore Plaintiff's salary would not change if he moved to Federal Way instead of Ocean Shores. (*Id.*)  Plaintiff later indicated that he would be moving to the Seattle area instead, to which Pratt again confirmed that Plaintiff's salary would not change and that Pratt would update Plaintiff's new location.  (Pratt Decl. ¶¶ 40-42; Pl. Depo., Vol. I, Ex. 14 at APL-AREBALO 395.)

But Plaintiff never moved to the Seattle area and instead moved to Ocean Shores at the start of July 2017.  (Pl. Depo. Vol. I, 142:17-20.)  Also, because he did not notify Pratt of his move to Ocean Shores, Plaintiff continued to collect his regular salary as if he had moved to the Seattle area and was living in a Major Market location, when in fact he was not.  (*Id.* at 144:1-10.)  This resulted in Plaintiff being ***over***paid.  (Pratt Decl. ¶ 43.)  This remained unbeknownst to Pratt for more than a month and a half.  (*Id.* ¶ 44.)  Pratt only discovered that Plaintiff had moved to Ocean Shores after he asked for Plaintiff's address in mid-August 2017.  (Pratt Decl. ¶ 45, Ex. 9; Pl. Depo., Vol. I, 143:7-13, 145:19-24, Ex. 18.)  At that point, Plaintiff confessed to Pratt that he had moved to Ocean

Shores.  (Pratt Decl. ¶ 45, Ex. 9; Pl. Depo., Vol. I, 145:19-24, Ex. 18.)

In deposition, Plaintiff claimed that he did not know how to change his address in Apple's directory and belatedly spoke with one of his colleagues in August 2017 who showed him how to change his address.  (*Id.* at 146:13-22.)  But even then, Plaintiff still never changed his address on Merlin or any other company directory.[2]  (*Id.* at 154:7-9.)

Pratt issued Plaintiff a misconduct warning for failing to abide by Apple's moving policy on September 1.  (*Id.* at 151:22-23, Ex. 16.)  Plaintiff acknowledges that his employment could have been terminated for his failing to abide by Apple's moving policy, but, in Plaintiff's words, he was not termination after Pratt went "to bat" for him.  (*Id.* at 152:3-23; Pratt Decl. ¶ 46.)

### 7.    Plaintiff is Placed on a Documented Coaching Plan in November 2017.

Despite the corrective guidance offered by his Action Plan, Pratt believed Plaintiff's performance remained inconsistent and uneven.  (Pratt Decl. ¶ 47.)  For example, as of August 2017, Plaintiff still had an issue with completing coaching sessions and reviewing his direct reports' timecards in a timely fashion.  (*Id.* ¶ 48, Ex. 11.)  Accordingly, in early October 2017, Pratt decided to begin the process of placing Plaintiff on a formal Documented Coaching Plan.  (*Id.* at ¶ 49.)

After consulting with and obtaining approval from human resources, Pratt delivered a Documented Coaching Plan to Plaintiff on November 2, 2017.  (Pratt Depo. at 116:7-9, Ex. 22.) The Documented Coaching Plan reiterated areas where Plaintiff's performance continued to fall short of expectations: completion of coaching sessions, timely review of customer survey responses, timely review of attendance, and workflow management.  (Pratt Depo. Ex. 22 at APL-AREBALO 286).  The Documented Coaching Plan also identified areas for specific improvement. (*Id.*)  Through the Documented Coaching, Pratt sought to instill Plaintiff with good habits and best practices in an effort to address the workflow management problems that Pratt had observed in Plaintiff's performance going back almost seven months now, to April 2017.  (Pratt Decl. ¶ 50.) The Documented Coaching Plan required immediate, sustained performance improvement by Plaintiff over the period of one month, from November 3, 2017 to December 2, 2017; failure to make such improvement would be grounds for termination.  (*Id.* ¶ 51; Pratt Depo., Ex. 22 at APL-

---

[2] Merlin is Apple's human resources management system.

1   AREBALO 287.)

2          During the Documented Coaching period, Pratt met with Plaintiff weekly to assess his

3   progress.  (Pratt Decl. ¶ 53.)  In addition, Plaintiff was directed to meet with Mentor/GPS Coach

4   Steve Smillie at least twice.[3]  (Pl. Depo., Vol. I, at 185:13-15, 186:2-7; Pratt Depo. Ex. 22 at APL-

5   AREBALO 286.)  Smilie's role, however, was not to assess Plaintiff's performance or progress on

6   the Documented Coaching Plan; rather, as Smilie explained in his deposition, his role was simply

7   to serve as a general resource to Plaintiff on manager best practices.  (Jang Decl. ¶ 5, Ex. D,

8   Deposition of Steven Smillie ("Smillie Depo."), at 23:12-24:8.)  Smilie indicated that he does not

9   recall ever speaking with Pratt about Plaintiff's performance or Documented Coaching Plan.  (*Id.*

10  at 33:24-34:17; *see* Pratt Decl. ¶ 63.)

11          **8.      Plaintiff Falls Short in His Documented Coaching and is Terminated**

12                   **in December 2017.**

13          As noted above, Pratt met with Plaintiff weekly to assess Plaintiff's progress.  Pratt's recap

14  notes during the Documented Coaching Plan are summarized below.  Plaintiff's performance was

15  mixed, with Plaintiff missing expectations on areas where he already received coaching in the past,

16  most notably accurate and timely timecard review:

17     •   **Week 1 (11/09/17):** Pratt congratulated Plaintiff that he was off to a great start.

18          Plaintiff completed and uploaded notes for eight one-on-one coaching sessions

19          and reviewed all of his customer surveys within four days.  (Pratt Decl. ¶ 53a,

20          Ex. 13 at APL-AREBALO 312-13.)

21     •   **Week 2 (11/17/17):** Plaintiff's notes were missing entirely for two coaching

22          sessions, notes for three other coaching sessions were entered late (i.e., not

23          immediately after the coaching session as required by the Documented Coaching

24          Plan), and another coaching session needed to be rescheduled but was not

25          calendared.  Pratt remarked to Plaintiff: "Continue to document your sessions

26          immediately after they occur to prevent errors or lost notes.  You have made

27

28  _____
    [3] Smillie recalls meeting with Plaintiff only once.  (Smillie Depo. at 61:13-16.)  Plaintiff cancelled
    one of their two planned sessions and did not reschedule.  (*Id.*)
    DEFENDANT'S MOTION FOR SUMMARY JUDGMENT                      Case No. 5:19-CV-03034-EJD

improvement to your planning and task completion, but I am still concerned about [direct report's] missing notes and the missed deadline for your SGT completion.  I appreciate the adjustments that you are implementing."  (*Id.* ¶ 53b, Ex 13 at APL-AREBALO 312-13.)

- **Week 3 (11/28/17):** Pratt conducted a timecard audit of his managers' direct reports to ensure that his managers accurately and timely reviewed timecards. With respect to Plaintiff, Pratt discovered several timecard errors, including incorrect punches; incomplete timecard approvals; and missing "occurrences" (i.e., internal notations) for sick, vacation, or leave events.  (*Id.* ¶ 53c, Ex 13 at APL-AREBALO 314-15.)

- **Week 3 (11/30/17):** Pratt noted that Plaintiff improved in responding to customer surveys, responding to peer feedback, and calendaring coaching sessions.  Pratt also noted, however, that Plaintiff displayed significant misses, including: (1) failing to timely deliver a misconduct warning to one of Plaintiff's direct reports as expected, which allowed the direct report to continue his bad behavior; and (2) the timecard errors revealed by Pratt's timecard audit two days prior.  Pratt stated to Plaintiff, "I explained that these missed expectations do not satisfy our Documented Coaching plan.  I noted that I will take partners to review the improvements and continued opportunities."  (Pratt Decl. ¶ 53d, Ex 13 at APL-AREBALO 320.)

On November 30, 2017, Plaintiff wrote to Pratt attempting to "clarify" a few points raised in their one-on-one meeting.  (Pratt Decl. ¶ 55, Pl. Depo., Vol. I, Ex. 25 at APL-AREBALO 297.) Plaintiff claimed that the direct report to whom Plaintiff failed to deliver the misconduct warning did not continue his bad behavior.  (Pratt Decl. ¶ 56.)  Plaintiff also tried to blame the errors with Apple's system as the reason why he had not timely reviewed his direct reports' timecards.  (*Id.*)

Pratt responded that he would consider Plaintiff's points.  (Pratt Decl. ¶ 57; Ex. 14.)  Pratt also explained to Plaintiff that his review of the data showed that, contrary to Plaintiff's statement, the direct report to whom Plaintiff failed to deliver the misconduct warning did in fact continue his

bad behavior.  (*Id.*)  Specifically, the direct report continued to manipulate the chat system to avoid concurrent customer chats (*i.e.*, being assigned more than one customer chat at a time), which was the same conduct addressed by the two weeks late misconduct warning.  (*Id.*)  As for the timecard mistakes, Pratt explained that had Plaintiff timely reviewed his direct reports' timecards as required by the Documented Coaching Plan, the missed punches and payroll errors could have been avoided. (*Id.*)  Pratt also confirmed that no other managers had difficulty with Merlin during this time.  (Pratt Decl. ¶ 60.)

On December 2, 2017, Pratt initiated the termination of Plaintiff's employment because he failed to meet the requirements of the Documented Coaching Plan.  (Pratt Decl. ¶ 64, Ex. 15; Pl. Depo. Vol. I, 229:5-8.)  In doing so, Pratt identified the specific misses by Plaintiff during the Documented Coaching period:

- Missed training deadline after a reminder on 11/10/17
- Failed to document coaching session that was scheduled for 11/10
- Failed to conduct a coaching session for [confidential] before handing him off to his new Team Manager
- Sent an email on 11/18/17 to [confidential] team to announce that he would be approving timecards for [confidential]
- He announced that he reviews timecards on the Friday and Saturday as payroll ends. This is in direct opposition to his Documented Coaching Plan to review it every week at a minimum.
- Failed to deliver a Misconduct Warning to his advisor on 11/13/17
- He stated that he was too ill to meet with the advisor, but did not report the illness or alert me to the missed commitment. He did not deliver the Misconduct Warning until 11/25/17 after I reached out to ask him about it on 11/24/17.
- Failed to approve timecards by the due date of 11/25/17
- He approved the timecards on 11/26/17. He could not explain the timestamp, but claimed to approve timecards late Saturday night. He also explained that he "selected all" and approved them as a batch. This allowed him to overlook mistakes that caused two advisors to be underpaid.
- Failed to assess attendance occurrences as part of his timecard review which led to a delay in addressing these with advisors.[4]

(Pratt Depo. at Ex 41, APL-AREBALO-328.)

On December 4, 2017, Bishop reviewed and approved the termination request.  (Pratt Decl.

---

[4] Team managers should review their direct reports' timecards for errors (*e.g.*, mispunches and attendance notations) each day for the previous day worked. (Smillie Depo. at 72:22-73:19.) This allows for efficiency and ensures that timecards are approved and submitted on a timely basis to payroll. (*Id.* at 74:3-13; *see* Pratt Depo. at 129:1-17.)

¶ 65.)  Bishop's role was limited in doing so: he reviewed the documents provided to him and agreed that Plaintiff failed to meet the expectations of the Documented Coaching Plan, most notably the expectation that Plaintiff process timecards properly.  (Bishop Decl. ¶ 5.)  Bishop highlighted that Plaintiff's errors led to employees being underpaid and referenced the trust gap with Plaintiff due to the misconduct related to his move.  (*Id.*)  Apple terminated Plaintiff's employment the next day, on December 5, 2017.  (Pratt Decl. ¶ 67; Pl. Depo., Vol. I, 229:5-8.)

### C.   Plaintiff's Alleged Carpal Tunnel and Stretch Breaks.

The only document that even arguably shows Plaintiff mentioning his carpal tunnel to Pratt or asking for an accommodation from Pratt is a July 5, 2017 email, wherein Plaintiff requested time off.  (Pl. Depo., Vol. I, Ex. 11 at JA196.)  Specifically, after moving to Washington that weekend, Plaintiff wrote to Pratt: "My hands are not well with this trip."  (*Id.*)  Pratt did not tie this to carpal tunnel and simply thought Plaintiff's hands hurt due to moving (*e.g.*, moving boxes).  (Pratt Decl. ¶ 69.)  In response, Pratt approved Plaintiff taking time off, asked Plaintiff to make sure he secured backfill coverage, and suggested that Plaintiff contact Apple's third-party leave administrator about potential intermittent leave.  (*Id.* ¶ 71.)  The exchange concluded with Plaintiff taking the time off that he had asked for.  (*Id.*; Pl. Depo., Vol. I, at 121:14-20, 123:6-12.)

Plaintiff, nevertheless, asserts that he raised his carpal tunnel and need for short stretch breaks to Pratt on two other occasions.  First, Plaintiff asserts that he first raised his carpal tunnel and his need to take short stretch breaks to Pratt starting on June 30, 2017.  (*See* Pl. Depo., Vol I, at 80:8-20.)  On June 30, 2017, Pratt and Plaintiff discussed the timing for completing annual performance reviews for his direct reports.  (Pratt Decl. ¶ 72.)  Plaintiff asserted in deposition that during this meeting he mentioned to Pratt that his plan for completing the reviews built in time for stretch breaks.  (Jang Decl. ¶ 3, Ex. B, Pl. Depo., Vol. II, at 250:5-20.)

Second, Plaintiff asserts that he had a FaceTime meeting with Pratt on July 12, 2017 where Pratt viewed Plaintiff's calendar and instructed him to remove breaks from his calendar.  (Pl. Depo., Vol. I, at 89:10-15.)  According to Plaintiff, he scheduled five to ten-minute blocks of time on his personal calendar as breaks for his hands.  (*Id.* at 85:4-7.)  Plaintiff asserts that Pratt saw the blocks of time and essentially had Plaintiff remove them from his calendar.  (*Id.* at 75:24-77:7, 77:17-22,

85:21-86:6.)  Notably, however, in deposition Plaintiff could not recall the name of this alleged calendar, the title of these alleged breaks, the color of the alleged blocks of time on his calendar, nor even the "verbiage" that Pratt allegedly used that caused Plaintiff to remove the breaks from his calendar.  (*Id.* at 85:8-86:6.)

**D.     Plaintiff's Alleged Two Meetings with Bishop About Employee Concerns.**

Plaintiff asserts that he had two meetings with Bishop, one in August or September 2017 and another in November 2017.  (Pl. Depo., Vol. I, at 124:17-125:7.)  With respect to the August or September 2017 meeting, Plaintiff testified in his deposition that he wanted to inquire with Bishop into putting stretch breaks on employees' schedules to prevent injuries.  (*Id.* at 127:1-7.)  According to Plaintiff, Bishop responded that he would ask the scheduling team and see if they could manage some time to discuss.  (*Id.* at 127:8-15.)  It was a quick discussion.  (*Id.*)

As for the November 2017 meeting, Plaintiff asserts that he met with Bishop and shared some of his "findings" regarding stretch breaks and what Plaintiff thought were potential OSHA violations.  (*Id.* at 129:6-14.)  According to Plaintiff, Bishop responded, "I don't need this shit," but then the two proceeded to have a "good dialogue."  (*Id.* at 129:15-20.)  According to Plaintiff, the meeting concluded with Plaintiff and Bishop scheduling another meeting a few weeks later to follow up.  (Pl. Depo., Vol. II, at 272:11-21.)  Plaintiff did not feel human resources was needed since he and Bishop outlined a plan to tackle the issue.  (*Id*.)  Pratt had no knowledge of the alleged meetings between Plaintiff and Bishop.  (Pratt Decl. ¶ 66.)

**E.     Plaintiff's Current Lawsuit.**

On June 11, 2018, Plaintiff filed a charge of discrimination with the EEOC.  (Pl. Depo., Vol. I, Ex. 3.)  Plaintiff subsequently filed a Complaint and initiated this action on May 31, 2019.  (See ECF No. 1 ("Compl.").)  The Complaint asserts two causes of action: (1) violation of the ADA; and (2) wrongful termination in violation of California public policy.  (*Id*.)

**IV.   ARGUMENT**

**A.     Summary Judgment Standard.**

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

1    56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  An issue of material fact is "genuine" when

2    the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Thrifty*

3    *Oil Co. v. Bank of Am. Nat. Trust & Savings Assoc.*, 322 F.3d 1039, 1046 (9th Cir. 2003).

4         On any claim that the non-moving party will have the burden of proof at trial, the movant

5    may obtain summary judgment either by producing evidence negating an essential element of the

6    non-moving party's claim or by merely pointing out an absence of evidence supporting the non-

7    moving party's claim.  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  If

8    the movant satisfies this initial burden, then the opposing party must go beyond the pleadings and

9    "show a genuine issue of material fact by presenting *affirmative evidence* from which a jury could

10   find in [its] favor." *FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009) (emphasis in the original).

11   "[B]ald assertions or a mere scintilla of evidence" will not suffice.  *Id.*  "If the nonmoving party

12   fails to produce enough evidence to create a genuine issue of material fact, the moving party wins

13   the motion for summary judgment." *Nissan Fire & Marine Insurance Co., Ltd. v. Fritz Cos., Inc.*,

14   210 F.3d 1099, 1103 (9th Cir. 2000).

15         **B.      Plaintiff's First Cause of Action under the ADA Fails as a Matter of Law.**

16         Plaintiff's first cause of action under the ADA entails three different theories of liability:

17   (1) Apple failed to accommodate Plaintiff's alleged carpal tunnel; (2) Apple discriminated against

18   Plaintiff because of his alleged carpal tunnel; and (3) Apple retaliated against Plaintiff for opposing

19   purported disability discrimination.  (Compl. ¶ 32.)  As explained below, all three theories fail.

20         **1.      The Failure to Accommodate Theory of Liability Fails.**

21         To establish a claim for failure to accommodate, a plaintiff must show that he requested an

22   accommodation and his employer failed to provide the necessary accommodation.  *See* 42 U.S.C.

23   § 12112 (b)(5)(A); 29 C.F.R. § 1630.9(a).  In assessing the employee's request for accommodation,

24   an employer must engage in the interactive process, which "requires: (1) direct communication

25   between the employer and employee to explore in good faith the possible accommodations; (2)

26   consideration of the employee's request; and (3) offering an accommodation that is reasonable and

27   effective." *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002).  "Liability for

28   failure to provide reasonable accommodations [under the ADA] ensues only where the employer

1   bears responsibility for the breakdown." *Id.* at 1089.

2       Here, Plaintiff alludes to two bases in his Complaint for his alleged failure to accommodate

3   claim: (1) when Plaintiff allegedly informed Pratt that he could not work in early July 2017 because

4   of pain in his hands due to his move to Washington; and (2) when Pratt allegedly prohibited Plaintiff

5   from taking breaks for his hands during a FaceTime meeting in July 2017.  (Compl. ¶¶ 17-19.)

6   Neither basis supports a viable claim.

7       *First*, both theories are time barred.  A plaintiff must file a charge alleging a violation of the

8   ADA to the EEOC within either: (a) 180 days of the alleged unlawful conduct; or (b) 300 days of

9   the alleged unlawful conduct if the plaintiff "initially instituted proceedings" with a state or local

10  agency that is charged with enforcing anti-discrimination laws.  *See* 42 U.S.C. § 12117(a) (adopting

11  Title VII remedies and procedures for implementing the ADA); 42 U.S.C. § 2000e-5(e)(1)

12  (providing time limits for exhausting claims under Title VII).  Here, the events occurred in July

13  2017: Plaintiff asked Pratt for time off in early July 2017, and Plaintiff alleges that Pratt told him

14  to remove breaks from his calendar during a FaceTime meeting in "July 2017."  Therefore, even

15  assuming Plaintiff enjoys the longer 300-day exhaustion period, he had until May 29, 2018 at the

16  latest to file his charge with the EEOC.[5]  However, Plaintiff did not file within this window.  Rather,

17  he filed his charge relating to these matters with the EEOC on June 11, 2018.  (Pl. Depo., Vol. I,

18  Ex. 3.)  The claim is therefore time barred.

19      *Second*, to the extent that Plaintiff's failure to accommodate claim rests on his request to

20  take time off in early July 2017, it fails on the merits too.[6]  Plaintiff asked Pratt for time off because

21  _____

22  [5] This calculation gives Plaintiff every benefit of the doubt.  It assumes that the FaceTime meeting occurred on July 31, 2017; gives Plaintiff the maximum 300 days; and extends the deadline two days to account for the fact that May 27, 2018 was a Sunday and May 28, 2018 was Memorial Day.

23  [6] To be clear, Apple also firmly denies the merits of Plaintiff's allegation that Pratt told him to
24  remove breaks from his calendar during a FaceTime meeting.  *First*, Plaintiff's own recollection of these alleged stretch break calendar entries is suspiciously vague.  (*See* Pl. Depo., Vol. 1 at 75:24-77:7, 77:17-22, 85:21-86:6.)  *Second*, Pratt denies ever seeing stretch breaks on Plaintiff's calendar,
25  let alone instructing Plaintiff to remove them.  (Pratt Decl. ¶ 73; Pratt Depo. at 73:22-74:1.)  *Third*, Pratt would not have had any reason to be concerned about Plaintiff taking stretch breaks.  *Fourth*,
26  Plaintiff did not have one-on-one coaching sessions with his direct reports every day and, on the days that he did, he only had three or four sessions in a day.  (Pl. Depo., Vol. 1 at 87:17-24.)  Thus,
27  there would have been no reason why Plaintiff could not have arranged those coaching sessions in a way that would have permitted stretch breaks every hour.  However, with that said, Apple
28  understand the limitations of a motion for summary judgment.

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT                    Case No. 5:19-CV-03034-EJD

1    his "hands [were] not well with [his] trip" moving from California to Washington that weekend.

2    (Pl. Depo., Vol. I, Ex. 11.)  However, there is no dispute that Pratt addressed Plaintiff's hand pain

3    and request for time off.  Two days after that request, Pratt told Plaintiff to simply request backfill

4    coverage and asked Plaintiff if he had connected with Apple's third-party leave administrator about

5    a potential intermittent leave of absence.  Pratt also reminded Plaintiff to put in his request for sick

6    days for the four days Plaintiff planned to take off.  Plaintiff received all the time off that he

7    requested.  Any alleged failure to accommodate or engage in the interactive process claim arising

8    from this event plainly is contradicted by the undisputed facts, and summary judgment is warranted.

9                    **2.      The Disability Discrimination Theory of Liability Fails.**

10        To state a *prima facie* claim of disability discrimination under the ADA, a plaintiff must

11   show that (1) he is a disabled person within the meaning of the ADA; (2) he is a qualified individual

12   with a disability; and (3) he suffered an adverse employment action because of his disability.  *See*

13   *Nunes v. Wal-Mart Stores, Inc.,* 164 F.3d 1243, 1246 (9th Cir. 1999).  If a plaintiff establishes a

14   *prima facie* case of discrimination, the burden shifts to the employer to articulate a legitimate, non-

15   discriminatory reason for the adverse employment action.  *Id.* at 1247.  If the employer articulates

16   a legitimate, non-discriminatory reason for the adverse employment action, the burden then shifts

17   to the plaintiff to prove that the reason was merely a pretext for unlawful disability discrimination

18   by offering evidence that is both "specific" and "substantial."  *Godwin v. Hunt Wesson Inc.,* 150

19   F.3d 1217, 1222 (9th Cir. 1998).

20                    **a.      Plaintiff Cannot Show a *Prima Facie* Claim.**

21        Plaintiff cannot establish a *prima facie* claim of disability discrimination because Plaintiff

22   cannot show a causal link between his carpal tunnel and the decision to terminate his employment.

23   Plaintiff relies on temporal proximity to show causation.  Plaintiff contends that Pratt terminated

24   his employment only after Plaintiff first informed Pratt of his carpal tunnel in early July 2017.  (*See*

25   Compl. ¶ 17.)  Plaintiff takes particular issue with a purported FaceTime meeting between him and

26   Pratt in July 2017 wherein Pratt allegedly told Plaintiff to remove short stretch breaks that were

27   noted in Plaintiff's calendar.  (*Id.* ¶ 19.)  But even assuming Plaintiff's assertions were true, there

28   is an insufficient connection between these events and Plaintiff's termination to establish causation

1    – even at the *prima facie* stage.

2          "The Ninth Circuit has held that periods as short as ***four months*** are too attenuated to prove

3    causation for purposes of the prima facie case."  *Kadiyan v. Medtronic*, No. CV 10-05921 MMM

4    (MANx), 2011 U.S. Dist. LEXIS 163991, at *31 (C.D. Cal. Apr. 8, 2011), *aff'd* 510 Fed. Appx.

5    649 (9th Cir. 2013) (emphasis added).  Here, Plaintiff was discharged on December 5, 2017 – in

6    other words, ***five months*** after Plaintiff allegedly first informed Pratt in July 2017 about his carpal

7    tunnel and stretch breaks.  Plaintiff also admitted in his deposition that after that point – and by no

8    later than August 2017 – he did not discuss or mention his carpal tunnel to Pratt ever again.  (*See*

9    Pl. Depo., Vol. II, at 259:23-261:16.)  This five-month gap between Plaintiff's alleged reference to

10   carpal tunnel and his termination undercuts Plaintiff's showing of causation.

11         Even more problematic for Plaintiff, Apple's concerns with his performance failures predate

12   his report of sore hands by several months.  The undisputed facts show that Pratt raised the

13   substantial performance criticisms that led to Plaintiff's termination as early as April 2017 (*i.e.*, at

14   least two months ***before*** Plaintiff alleges that he notified Pratt of his carpal tunnel).  Pratt began

15   continuously coaching Plaintiff with respect to timeliness of his coaching documentation as early

16   as April 2017, and Pratt identified several areas of performance deficiencies and gave Plaintiff an

17   "expected more" rating in Plaintiff's 2017 APR in June 2017.  Again, all of this occurred ***before***

18   Plaintiff allegedly first notified Pratt of his carpal tunnel, and therefore cannot possibly have been

19   motivated by Plaintiff's condition.  The sequence of these events therefore further disproves any

20   causation between Plaintiff's carpal tunnel and termination.  *See Arteaga v. Brink's, Inc.*, 163 Cal.

21   App. 4th 327, 353-54 (2008) (explaining that causation based on temporal proximity is greatly

22   undercut where, as here, the employer raised questions about the employee's performance before

23   he disclosed his alleged disability).

24         Finally, to the extent there is any doubt, Pratt's actions in connection with Plaintiff's moving

25   misconduct dispels any notion of discriminatory animus.  Plaintiff admits that he could have been

26   discharged in connection with this moving misconduct.  Yet, Pratt was the one who went "to bat"

27   for Plaintiff and saved him from discharge.  This was despite the fact that, according to Plaintiff,

28   Pratt was at this point fully aware of Plaintiff's carpal tunnel and stretch breaks.  Had Pratt harbored

some sort of discriminatory animus toward Plaintiff due to his carpal tunnel and stretch breaks as

Plaintiff alleges, it makes no sense for Pratt to have saved Plaintiff from discharge at that time.

### b.  Plaintiff Cannot Prove Pretext for Disability Discrimination.

Even if Plaintiff can somehow show a *prima facie* claim (he cannot), Plaintiff cannot as a

matter of law prove pretext for disability discrimination.

Apple's legitimate, non-discriminatory reason for terminating Plaintiff's employment (*i.e.*,

performance deficiencies related to workflow management and timeliness of tasks, among other

things) is well-documented.  Pratt began coaching Plaintiff on performance deficiencies related to

missed deadlines and workflow management as early as April 2017.  Notably, Pratt's observations

were entirely consistent with feedback that Plaintiff had received in his prior APRs dating back to

2015 and 2016.  (Pratt Decl. ¶¶ 11-13; Pratt Depo., Ex. 17 at JA043, Ex. 42 at APL-AREBALO

109.)

Plaintiff's performance deficiencies were again documented in his 2017 APR and the

Action Plan.  The 2017 APR, for example, listed specific, concrete examples of Pratt's observations

of Plaintiff failing to meet expectations:

- Documentation for coaching sessions or check ins have not been consistently loaded into GBI in a timely fashion. After Sherry addressed this in your previous APR and the Q1 QPR, you had shown improvement in Q2. However, in Q3, your coaching documentation was again not completed in a timely fashion. ***27.1% of your GBI documentation were entered on the last day of the periods.***

- Missed the expectation for SGT completion in three of the fiscal periods, P03, P06, and P08.

- Failed to document Team Meeting Minutes in a timely fashion for P05 and P08.

- Handoff email to peers has been lacking.  Key information about advisors, such as KinCare, attendance warnings, current action plans, etc. are needed by the receiving manager.

- Missed deadline for providing the Team Meeting spreadsheet to scheduling.

- Missed deadline to complete the ASM audit and provided inaccurate information about KinCare. (Submitted on 05/18, due 5/05).

(Pratt Depo., Ex. 19 at JA051.)  (emphasis added).  Critically, at no point did Plaintiff dispute

Pratt's feedback.  To the contrary, Plaintiff affirmatively acknowledged his performance shortfalls

when he wrote in his 2017 APR: "***I agree completely here!***  I am looking forward to continuing to

19

grow under your leadership, David." (Pl. Depo., Vol. I, Ex. 19 at JA053) (emphasis added).

Despite the feedback in the 2017 APR and Action Plan, Plaintiff continued to exhibit poor performance, and Pratt decided to place him on a Documented Coaching Plan. The Documented Coaching Plan provided clear standards that Plaintiff was required to meet, and plainly explained to Plaintiff that his continued failure to meet and sustain those performance standards could result in his termination. Yet, Plaintiff continued during the Documented Coaching period to fall short of those standards. During that time, Plaintiff (1) missed a training deadline after a reminder; (2) failed to document a coaching session; (3) failed to conduct a coaching session; (4) reviewed timecards on the Friday and Saturday right before payroll ends; (5) failed to approve timecards timely, resulting in underpayment of employees; (6) failed to deliver a Misconduct Warning, which led to further misconduct; and (7) failed to review and address attendance issues with his direct reports. (*See* Pratt Depo., Ex 41 at APL-AREBALO-328.) As a result of Plaintiff's continued performance shortfalls – ***and solely for that reason*** – Pratt decided to end Plaintiff's employment. This was a culmination of more than ***seven months*** of coaching, a significant portion of which occurred before Plaintiff alleges that he first informed Pratt that he had carpal tunnel.

Against this background, as a matter of law Plaintiff cannot prove, let alone with "specific" and "substantial" evidence, that Apple's reason for ending his employment was pretext for disability discrimination. *Godwin,* 150 F.3d at 1222. Plaintiff may disagree with the termination decision, but his mere disagreement does not support a discrimination claim. *See Wallis v. J.R. Simplot, Co*., 26 F.3d 885, 890 (9th Cir. 1994).

### 3.    The Retaliation Theory of Liability Fails.

To establish a *prima facie* case of retaliation under the ADA, Plaintiff must show that: (1) he engaged in protected activity; (2) his employer subjected him to an adverse employment action; and (3) a causal link exists between the two. *See Brown v. City of Tucson,* 336 F.3d 1181, 1186-87 (9th Cir. 2003). Protected activities include: (1) opposing an employment practice that violates the ADA; or (2) participating in a statutorily authorized proceeding to enforce the ADA. 42 U.S.C. § 12203(a). If Plaintiff is able to establish a *prima facie* case, Apple is then required to articulate a legitimate, non-retaliatory reason for the alleged adverse employment action. *Id.* Finally, if Apple

is able to articulate such a reason, the burden shifts to Plaintiff to prove that the reason was pretext for retaliation.  *Id.*  Plaintiff's evidence of pretext must be both "specific" and "substantial."  *Stegall v. Citadel Broad. Co.,* 350 F.3d 1061, 1066 (9th Cir. 2003).

Here, Plaintiff suggests two bases in his Complaint for his retaliation theory of liability.  *First*, Plaintiff suggests Pratt gave him a misconduct warning as retaliation for his taking stretch breaks and time off for his hand pain.  (*See* Compl. ¶ 17.)  *Second*, Plaintiff suggests that his termination was retaliation for mentioning his concerns about employee health and stretch breaks to Bishop in November 2017.  (*See id.* ¶¶ 23, 26.)  As explained below, both theories fail.

### a.      The Moving Misconduct

Apple disciplined Plaintiff for a legitimate, non-discriminatory reason.  Plaintiff admitted that he understood Apple's policy that remote workers such as himself must notify their manager and seek prior approval for a move.  This policy requirement is important because remote workers' compensation is tied to their location.  Plaintiff, however, disregarded this policy requirement when he failed to notify Pratt of his decision to move to Ocean Shores, Washington, instead of Seattle, Washington.  Plaintiff also disregarded this requirement when he failed to update his address in Apple's internal system.  Plaintiff's actions caused him to be paid a higher salary than he should have received, a consequence that he appears to have fully understood, and one in direct violation of Apple's policies.  Plaintiff lacks any evidence, let alone "specific" and "substantial" evidence, to prove that the discipline he received for this misconduct was motivated by anything other than that misconduct.  *Stegall,* 350 F.3d at 1066.

### b.      The Alleged Concerns About Employee Health to Bishop

To the extent that Plaintiff's retaliation theory rests on his alleged discussion with Bishop about his concerns over employee health and stretch breaks, it also falters at the *prima facie* stage.  Pratt initiated Plaintiff's Documented Coaching and termination, but there is no evidence that Pratt ever learned about Plaintiff's alleged discussions with Bishop.  Indeed, Plaintiff specifically admits that he is unaware of Bishop ever discussing Plaintiff's alleged carpal tunnel or stretch breaks with Pratt.  (Jang Decl. ¶ 6, Ex. E, Pl.'s Response to Request for Admissions No. 8.)  Because there is no evidence that Pratt knew about Plaintiff's alleged discussions with Bishop, as a matter of law

1  Plaintiff cannot show that Pratt was motivated by the meetings to terminate Plaintiff's employment,
2  and therefore his claim must fail at the *prima facie* stage.

3        Moreover, even if Plaintiff could somehow show causation at the *prima facie* stage, his
4  claim still fails at the pretext stage.  As explained above, Pratt initiated Plaintiff's Documented
5  Coaching Plan and termination for legitimate, non-retaliatory reasons.  Pratt's termination decision
6  followed a months-long, well-documented history of coaching Plaintiff about his performance
7  deficiencies.  (*See*, *supra*, Section IV.B.1.b.)  Plaintiff, meanwhile, cannot prove that these reasons
8  were pretext for retaliation.

9        To prove pretext, Plaintiff will point to his alleged conversation with Bishop in November
10  2017, during which Bishop allegedly said that he did not "need this shit" when Plaintiff mentioned
11  a proposed letter to Apple's Chief Executive Officer.  But even assuming Bishop said this, it at
12  most amounts to an off-the-cuff remark that is insufficient to meet Plaintiff's burden of proving
13  pretext through "specific" and "substantial" evidence.

14        *First,* the full context of the alleged conversation between Plaintiff and Bishop shows that
15  the purported remark was little more than an initial off-the cuff remark.  Plaintiff admitted in his
16  deposition that despite the initial off-the-cuff remark, he and Bishop proceeded to have a "good
17  dialogue" about the issues Plaintiff hoped to raise, made a plan to address the issues, and scheduled
18  and accepted a calendar invite for a few weeks later to reconvene with Plaintiff on the matter.
19  According to Plaintiff, he considered Bishop's plan to be sufficiently satisfactory that he did not
20  believe it was necessary to reach out to human resources.  Thus, contrary to evidencing retaliatory
21  animus, Plaintiff's testimony shows that Bishop constructively responded to Plaintiff's concerns.

22        *Second*, Bishop did not make this comment in the context of any performance or termination
23  discussion about Plaintiff.  Thus, the alleged remark offers little insight into Bishop's view or
24  motivation with respect to Plaintiff's termination.  *See Merrick v. Farmers Ins. Group*, 892 F.2d
25  1434, 1438 (9th Cir. 1990) (citing  *Smith v. Firestone Tire and Rubber Co.*, 875 F.2d 1325, 1330
26  (7th Cir. 1989) and noting that "[stray] remarks, . . . when unrelated to the decisional process, are
27  insufficient to demonstrate that the employer relied on illegitimate criteria, even when such
28  statements are made by the decision-maker in issue.".)

*Third*, Pratt, not Bishop, initiated Plaintiff's Documented Coaching Plan and termination. Bishop simply reviewed Pratt's termination request.  Moreover, to the extent Bishop agreed with the termination decision, Bishop specifically explained his reason for doing so: Plaintiff's performance issues caused employees to be underpaid and a trust gap existed as a result of Plaintiff's move-related misconduct.  Both of these reasons are legitimate, and nothing suggests retaliatory animus.

*Fourth*, again, Pratt decided to terminate Plaintiff's employment, yet Pratt did not know about the alleged meetings between Plaintiff and Bishop.  (Pratt Decl. ¶ 66.)

In sum, this retaliation theory fails because (1) Plaintiff cannot show that Pratt knew about his alleged discussions with Bishop, and therefore there is no causal connection to Pratt's decision to place Plaintiff on a Documented Coaching Plan or later terminate Plaintiff's employment; and (2) Plaintiff cannot prove with "specific" and "substantial" evidence that his termination was mere pretext for retaliation for his alleged discussions with Bishop.  *Stegall*, 350 F.3d at 1066.  Summary judgment is warranted.

### C.    Plaintiff's Second Cause of Action for Wrongful Termination in Violation of *California* Public Policy Fails as A Matter of Law.

Plaintiff contends that the conduct purportedly giving rise to the ADA claims discussed above also gives rise to a claim for wrongful termination in violation of ***California*** public policy – specifically, California's public policy against disability discrimination and retaliation as provided in California's Fair Employment and Housing Act ("FEHA").  (Compl. ¶¶ 39, 41, 43.)  Plaintiff is mistaken.  Plaintiff cannot assert a claim for wrongful termination in violation of ***California*** public policy because California law does not apply (and thus no California cause of action exists) where, as here, the alleged wrongful termination did not occur in California.

Under the presumption against extraterritorial application of state law, courts presume that California statutes and laws do not have any extraterritorial application or effect.  *See North Alaska Salmon Co. v. Pillsbury*, 174 Cal. 1, 4 (1916) ("Ordinarily the statutes of a state have no force beyond its boundaries."); *O'Connor v. Uber Technologies, Inc.*, 58 F. Supp. 3d 989, 1006 (2014) (N.D. Cal. Sept. 4, 2014) ("California's presumption against extraterritorial application of its laws

1    dates back to at least 1916.") (citation omitted).  This well-established presumption may be rebutted

2    only where legislative intent to do so is "clearly expressed or reasonably to be inferred 'from the

3    language of the act or from its purpose, subject matter or history.'"  *Sullivan v. Oracle Corp.*, 51

4    Cal. 4th 1191, 1207 (2011) (citation omitted).

5        Thus, for example, the FEHA may not be applied extraterritorially.  *See Campbell v. Arco*

6    *Marine, Inc.*, 42 Cal. App. 4th 1850, 1858-59 (1996).  The California Legislature enacted the FEHA

7    for the benefit of the "people of the State of California."  *Id.* at 1860.  The statute was not enacted

8    to interfere with employment relationships performed entirely within the boundaries of other states.

9    *Id.* at 1859.  Such extraterritorial application of the FEHA would not only run counter to the

10   statute's own language, but it would also raise "serious constitutional concerns."  *Id.* at 1858.  Thus,

11   the FEHA must "not be construed to apply to nonresidents employed outside [of California] when

12   the [alleged] tortious conduct did not occur in California."  *Id.* at 1860.

13       Here, Plaintiff's termination did not occur in California.  Plaintiff did not work or reside in

14   California at the time of his alleged wrongful termination in December 2017.  Rather, Plaintiff

15   worked and resided in Ocean Shores, Washington, at the time of his termination.  (*See* Pl. Depo.,

16   Vol. I, at 21:7-18.)  Nor did Pratt or Bishop have any connection to California during Plaintiff's

17   termination.  Pratt worked, resided, and decided to terminate Plaintiff's employment in Texas.

18   (Pratt Decl. ¶ 3; Pratt Depo., 9:1-2.)  Meanwhile, Bishop worked, resided, and approved Pratt's

19   decision in Washington.  (Bishop Decl. ¶ 6.)

20       Accordingly, because Plaintiff's termination did not occur in California, Plaintiff's claim

21   for wrongful termination in violation of California public policy fails as a matter of law.[7]  *See, e.g.*,

22   *Gonsalves v. Infosys Techs., Ltd.*, No. 09-04112 MHP, 2010 U.S. Dist. LEXIS 44401, at *13-18

23   (N.D. Cal. May 5, 2010) (dismissing FEHA and wrongful termination in violation of public policy

24   claims where the plaintiff failed to show a sufficient nexus between the alleged wrongful conduct

25   and California).

26

27   _____

     [7] This claim would also fail of course if the Court finds in favor of Apple on the discrimination and
28   retaliation allegations underlying the ADA claim.  *See, e.g.*, *Hanson, Hanson v. Lucky Stores, Inc.*,
     74 Cal. App. 4th 215, 229 (2009) (granting summary judgment in defendant's favor on wrongful
     termination claim where the underlying claims of discrimination failed).

1

## V.   CONCLUSION

2
     For all the reasons set forth above, Apple respectfully requests the Court grant summary

3
judgment in its entirety and enter judgment in Apple's favor.

4

5
Dated:  February 1, 2021                                     JACKSON LEWIS P.C.

6

7
                                              By:    /s/ Scott P. Jang
                                                     Mitchell Boomer
8
                                                     Scott Jang
                                                     Yuki Cruse
9
                                                     Attorneys for Defendant APPLE INC.
                                                     APPLE INC.
10
4846-5297-3274, v. 3

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28