Mitchell F. Boomer (State Bar No. 121441)
Scott P. Jang (State Bar No. 260191)
Yuki Cruse (State Bar No. 310073)
JACKSON LEWIS P.C.
50 California Street, 9th Floor
San Francisco, CA  94111
Telephone	(415) 394-9400
Facsimile:	(415) 394-9401
E-mail:	Mitchell.Boomer@jacksonlewis.com
E-mail:	Scott.Jang@jacksonlewis.com
E-mail:	Yuki.Cruse@jacksonlewis.com

Attorneys for Defendant
APPLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| JOSH AREBALO,<br><br>Plaintiff,<br><br>v.<br><br>APPLE, INC.; a California Corporation; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No. 5:19-cv-03034-EJD<br><br>**DEFENDANT'S SEPARATE STATEMENT IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date:	May 6, 2021<br>Time:	9:00 a.m.<br>Judge:	Edward J. Davila<br>Courtroom:	4<br><br>Complaint Filed:	May 31, 2019<br>Trial Date:	None Set |
|---|---|

| Claim or Defense | Moving Party's Undisputed Facts / Supporting Evidence | Opposing Party's Response / Supporting Evidence |
|---|---|---|
| **Claim 1 – Failure to Provide Reasonable Accommodation in Violation of Americans with Disabilities Act** | | |
| 1. Plaintiff's claim is time-barred. | Fact 1.  Plaintiff asserts that he first raised his carpal tunnel and his need to take short stretch breaks to Pratt starting on June 30, 2017.  (*See* Pl. Depo., Vol I, at 80:8-20.) | |
| | Fact 2.  On July 5, 2017, Plaintiff wrote to Pratt: "My hands are not well with this trip" and asked Pratt for time off.  (Pl. Depo., Vol. I, Ex. 11 | |

| | | | |
|---|---|---|---|
| | | at JA196.) | |
| | | Fact 3.  Plaintiff asserts that he had a FaceTime meeting with Pratt on July 12, 2017 where Pratt viewed Plaintiff's calendar and instructed him to remove breaks from his calendar.  (Pl. Depo., Vol. I, 89:10-15.) | |
| | | Fact 4.  Even assuming Plaintiff enjoys the longer 300-day exhaustion period, he had until May 29, 2018 at the latest to file with the EEOC his charge relating to his reasonable accommodation claim.  (*See* 42 U.S.C. § 12117(a) (adopting Title VII remedies and procedures for implementing the ADA); 42 U.S.C. § 2000e-5(e)(1) (providing time limits for exhausting claims under Title VII).) | |
| | | Fact 5.  Plaintiff filed with the EEOC his Charge relating to his reasonable accommodation claim on June 11, 2018, which is past the 300-day exhaustion period.  (Pl. Depo., Vol. I, Ex. 3.) | |
| 2. | Defendant engaged in direct communication with plaintiff to explore in good faith possible accommodations and took into consideration Plaintiff's accommodation request. | Fact 6.  On July 5, 2017, Plaintiff wrote to Pratt: "My hands are not well with this trip" and asked Pratt for time off.  (Pl. Depo., Vol. I, Ex. 11 at JA196.) | |
| | | Fact 7.  Two days after Plaintiff's request on July 5 2017, Pratt told Plaintiff to request backfill coverage and asked Plaintiff if he connected with Defendant's third-party leave administrator about a potential intermittent leave of absence.  Pratt also reminded Plaintiff to put in his request for sick days for the four days Plaintiff planned to take off.  (Pratt Decl. ¶ 69-71; Pl. Depo. Vol. I, Ex. 11 at JA196.) | |
| 3. | Defendant offered an accommodation that was | Fact 8.  Plaintiff received all the time off that he requested in | |

2

DEFENDANT'S SEPARATE STATEMENT                                                      Case No. 5:19-CV-03034-EJD

| | | |
|---|---|---|
| | reasonable and effective. | Plaintiff's July 5 2017 request to Pratt. (Pratt Decl. ¶ 71.; Pl. Depo., Vol. I, at 121:14-20, 123:6-12.) | |
| **Claim 2 – Disability Discrimination in Violation of Americans with Disabilities Act** | | |
| 1. Plaintiff cannot rely on temporal proximity to show a causal link between his disability and the decision to terminate his employment. | Fact 9. Plaintiff was discharged on December 5, 2017, *five months* after Plaintiff allegedly first informed Pratt in July 2017 about his carpal tunnel and stretch breaks. (Pratt Decl. ¶ 67; Pl. Depo., Vol. I, 80:8-20; 229:5-8; s*ee* Pl. Depo., Vol I, at 80:8-20.) | |
| | Fact 10. Plaintiff admitted in his deposition that after he informed Pratt in July 2017 about his carpal tunnel – and by no later than August 2017 – he did not discuss or mention his carpal tunnel to Pratt ever again. (*See* Pl. Depo., Vol. II, at 259:23-261:16.) | |
| | Fact 11. Pratt began coaching Plaintiff with respect to timeliness of his coaching documentation as early as April 2017 (*i.e.*, at least two months *before* Plaintiff alleges that he notified Pratt of his carpal tunnel) on June 30, 2017. (Pratt Decl. ¶ 14; Pratt Depo. at 26:3-5; 38:1-4.) | |
| | Fact 12. Pratt drafted Plaintiff's 2017 Annual Performance Review in June 2017 and completed the document by June 22, 2017, which occurred *before* Plaintiff allegedly first notified Pratt of his carpal tunnel on June 30, 2017. (Pratt Decl. ¶ 19, Ex. 4; Pratt Depo. at 52:2-8; *see* Pl. Depo., Vol I, at 80:8-20.) | |
| 2. Plaintiff cannot establish discriminatory animus by relying on the discipline he received for violating Defendant's moving policy. | Fact 13. Plaintiff admits that he could have been discharged for failing to abide by Defendant's moving policy. (Pl. Depo., Vol. I, 152:3-23; Pratt Decl. ¶ 46.) | |

| | | | |
|---|---|---|---|
| | | Fact 14.  Plaintiff claims Pratt was the one who went "to bat" for Plaintiff and saved him from discharge.  This was despite the fact that, according to Plaintiff, Pratt was at this point fully aware of Plaintiff's carpal tunnel and stretch breaks. (Pl. Depo., Vol. I, 80:8-20, 152:3-23; Pratt Decl. ¶ 46.) | |
| | 3. Plaintiff cannot prove pretext for disability discrimination because Defendant terminated Plaintiff's employment for legitimate, non-discriminatory reasons. | Fact 15.  As early as April 2017, Pratt observed gaps in Plaintiff's performance. (Pratt Decl. ¶ 6; Pratt Depo. at 38:11-22.) | |
| | | Fact 16.  Of specific concern to Pratt in 2017, it appeared Plaintiff was not conducting one-on-one coaching sessions with his direct reports, which was an essential part of Plaintiff's job duties as a Team Manager.  (Pratt Decl. ¶ 7.) | |
| | | Fact 17.  Pratt began coaching Plaintiff on performance deficiencies related to missed deadlines and workflow management as early as April 2017.  (Pratt Decl. ¶ 14; Pratt Depo. at 26:3-5; 38:1-4.) | |
| | | Fact 18.  In 2015, Pratt previously coached Plaintiff on similar performance deficiencies by Plaintiff that Pratt also observed in 2017. (Pratt Decl. ¶ 11; Pl. Depo., Vol. I, Ex. 17.) | |
| | | Fact 19.  As documented in Plaintiff's 2015 Annual Performance Review, Pratt worked with Plaintiff on managing the workflow of the coaching sessions to ensure Plaintiff had sufficient time to complete them during the month.  (*See* Pratt Decl. ¶ 12; Pratt Depo., Ex. 17 at JA043.) | |
| | | Fact 20.  In 2016, Plaintiff's then-manager, Sherry Gonzalez, noted in Plaintiff's coaching documentation | |

| | | |
|---|---|---|
| | | similar deficiencies observed by Pratt in 2017.  (Pratt Decl. ¶ 13; Pratt Depo., Ex. 42 at APL-AREBALO 109.) | |
| | | Fact 21.  Plaintiff's performance deficiencies were documented in his 2017 Annual Performance Review.  (Pratt Depo., Ex. 19 at JA051.) | |
| | | Fact 22.  The 2017 Annual Performance Review listed specific, examples of Pratt's observations of Plaintiff failing to meet expectations.  (Pratt Depo., Ex. 19 at JA051.) | |
| | | Fact 23.  At no point when Plaintiff received the 2017 Annual Performance Review from Pratt did Plaintiff dispute Pratt's feedback.  (*See* Pl. Depo. Vol. I, Ex. 19 at JA053.) | |
| | | Fact 24.  Plaintiff wrote in his 2017 Annual Performance Review: "I agree completely here!  I am looking forward to continuing to grow under your leadership, David."  (Pl. Depo. Vol. I, Ex. 19 at JA053.) | |
| | | Fact 25.  When an employee receives an "expected more" rating in an annual performance review, the employee's manager is expected to provide direct coaching to the employee to improve their performance.  (Pratt Decl. ¶ 27.) | |
| | | Fact 26.  On or around July 12, 2017, Pratt and Plaintiff met in a one-on-one meeting to discuss an "Action Plan" that identified ways to help Plaintiff address the observed performance issues by Pratt.  (Pratt Decl. ¶ 28; Pl. Depo., Vol. I, at 173:23-174:4, Ex. 20.) | |
| | | Fact 27.  The Action Plan outlined the performance issues, including Plaintiff's continued failure to timely complete and upload his coaching session notes, and created a plan for addressing the issues.  (Pratt Decl. ¶ 29; | |

| | | |
|---|---|---|
| | Pl. Depo., Vol. I, Ex. 20.) | |
| | Fact 28. The Action Plan focused particularly on Plaintiff's workflow management. (Pratt Decl. ¶ 30.) | |
| | Fact 29. The Action Plan therefore focused on ensuring Plaintiff allotted himself sufficient time to complete his core job duties without being interrupted by others. (Pratt Decl. ¶ 32; *see* Pl. Depo., Vol. I, Ex. 20 at APL-AREBALO 82.) | |
| | Fact 30. Despite the corrective guidance offered by his Action Plan, Pratt believed Plaintiff's performance remained inconsistent and uneven. (Pratt Decl. ¶ 47.) | |
| | Fact 31. As of August 2017, Plaintiff still had an issue with completing coaching sessions and reviewing his direct reports' timecards in a timely fashion. (Pratt Decl. ¶ 48, Ex. 11.) | |
| | Fact 32. After consulting with and obtaining approval from human resources, Pratt delivered a Documented Coaching Plan to Plaintiff on November 2, 2017. (Pratt Depo. at 116:7-9, Ex. 22.) | |
| | Fact 33. The Documented Coaching Plan reiterated areas where Plaintiff's performance continued to fall short of expectations: completion of coaching sessions, timely review of customer survey responses, timely review of attendance, and workflow management. (Pratt Depo. Ex. 22 at APL-AREBALO 286). | |
| | Fact 34. The Documented Coaching Plan required immediate, sustained performance improvement by Plaintiff over the period of one month, from November 3, 2017 to December 2, 2017; failure to make such improvement would be grounds for termination. | |

| | | |
|---|---|---|
| | (Pratt Decl. ¶ 51; Pratt Depo., Ex. 22 at APL-AREBALO 287.) | |
| | Fact 35.  During the Documented Coaching period, Plaintiff (1) missed a training deadline after a reminder; (2) failed to document a coaching session; (3) failed to conduct a coaching session; (4) reviewed timecards on the Friday and Saturday right before payroll ends; (5) failed to approve timecards timely, resulting in underpayment of employees; (6) failed to deliver a Misconduct Warning, which led to further misconduct; and (7) failed to review and address attendance issues with his direct reports.  (*See* Pratt Depo., Ex 41 at APL-AREBALO-328.) | |
| | Fact 36.  Pratt testified that his reason for terminating Plaintiff's employment was based on Plaintiff's inability to satisfy the standards in the Documented Coaching Plan. (Pratt Decl. ¶ 64, Ex. 15; Pl. Depo. Vol. I, 229:5-8.) | |
| | Fact 37.  Plaintiff's termination was a culmination of more than *seven months* of coaching, three months of which occurred *before* Plaintiff alleges that he first informed Pratt that he had carpal tunnel.  (Pratt Decl. ¶ 50; *see* Pl. Depo., Vol I, at 80:8-20.) | |
| **Claim 3 – Retaliation in Violation of Americans with Disabilities Act** | | |
| 1. Defendant disciplined Plaintiff for a legitimate, non-discriminatory reason. | Fact 38.  Defendant has a policy that requires At-Home Advisor Team Managers like Plaintiff to notify their manager and seek prior approval before a move.  (Pl. Depo., Vol. I, at 94:16-20, Pratt Decl. ¶ 34, Ex. 8.) | |
| | Fact 39.  Plaintiff admitted that he understood Defendant's policy that remote workers such as himself must notify | |

| | | |
|---|---|---|
| | their manager and seek prior approval for a move. (Pl. Depo. Vol. I, at 134:22-135:4, Ex. 12.) | |
| | Fact 40. Plaintiff specifically informed Pratt that he was considering moving to Ocean Shores, Washington. (Pratt Decl. ¶ 37, Ex. 9; Pl. Depo., Vol. I, Ex. 13 at APL-AREBALO 392.) | |
| | Fact 41. Pratt responded by congratulating Plaintiff on his move and informing Plaintiff that, because Plaintiff was moving outside a Major Market pay scale location, his salary would be reduced. (Pl. Depo., Vol. 1, Ex. 13 at APL-AREBALO 392.) | |
| | Fact 42. Pratt asked Plaintiff to confirm his move to Ocean Shores so that he could enter the new address in Apple's human resources system. (*Id.*) | |
| | Fact 43. In response to Pratt indicating a potential drop in pay, Plaintiff then suggested that he was considering moving to Federal Way, Washington, which is within the Seattle Metropolitan area. (Pl. Depo., Vol. 1, Ex. 13 at APL-AREBALO 391.) | |
| | Fact 44. Pratt replied that Federal Way was considered a Major Market and therefore Plaintiff's salary would not change if he moved to Federal Way instead of Ocean Shores. (*Id.*) | |
| | Fact 45. Plaintiff later indicated that he would be moving to the Seattle area instead, to which Pratt again confirmed that Plaintiff's salary would not change and that Pratt would update Plaintiff's new location. (Pratt Decl. ¶¶ 40-42; Pl. Depo., Vol. 1, Ex. 14 at APL-AREBALO 395.) | |
| | Fact 46. Plaintiff never moved to the Seattle area and instead moved to Ocean Shores at the | |

| | | | |
|---|---|---|---|
| | | start of July 2017. (Pl. Depo. Vol. I, 142:17-20.) | |
| | | Fact 47. Because Plaintiff did not notify Pratt of his move to Ocean Shores, Plaintiff continued to collect his regular salary as if he had moved to the Seattle area and was living in a Major Market location, when in fact he was not. This resulted in Plaintiff being *over*paid. (Pl. Depo. Vol. I, 144:1-10; Pratt Decl. ¶ 43.) | |
| | | Fact 48. Plaintiff's move to Ocean Shores instead of Seattle remained unbeknownst to Pratt for more than a month and a half. Pratt only discovered that Plaintiff had moved to Ocean Shores after he asked for Plaintiff's address in mid-August 2017. At that point, Plaintiff confessed to Pratt that he had moved to Ocean Shores. (Pratt Decl. ¶¶ 44-45, Ex. 9; Pl. Depo., Vol. I, 143:7-13, 145:19-24, Ex. 18.) | |
| | | Fact 49. In deposition, Plaintiff claimed that he did not know how to change his address in Defendant's directory and belatedly spoke with one of his colleagues in August 2017 who showed him how to change his address. (Pl. Depo., Vol. I, 146:13-22.) | |
| | | Fact 50. Plaintiff still never changed his address on Merlin or any other company directory. (Pl. Depo., Vol. I, 154:7-9.) | |
| | | Fact 51. Pratt issued Plaintiff a misconduct warning for failing to abide by Defendant's moving policy on September 1. (Pl. Depo., Vol. I, 151:22-23, Ex. 16.) | |
| | 2. Plaintiff cannot establish retaliatory animus by relying on the discipline he received for violating Defendant's moving policy. | Fact 52. Plaintiff admits that he could have been discharged for failing to abide by Defendant's moving policy. (Pl. Depo., Vol. I, 152:3-23; Pratt Decl. ¶ 46.) | |
| | | Fact 53. Plaintiff claims Pratt was the one who went "to bat" | |

| | | | |
|---|---|---|---|
| | | for Plaintiff and saved him from discharge.  This was despite the fact that, according to Plaintiff, Pratt was at this point fully aware of Plaintiff's carpal tunnel and stretch breaks.  (Pl. Depo., Vol. I, 80:8-20, 152:3-23; Pratt Decl. ¶ 46.) | |
| 3. | Plaintiff cannot establish a causal link between his termination and his engaging in alleged protected activity (i.e., his alleged discussion with Bishop about his concerns over employee health and stretch breaks). | Fact 54.  Pratt initiated Plaintiff's Documented Coaching and termination, but there is no evidence that Pratt ever learned about Plaintiff's alleged discussions with Bishop.  (Pratt Depo. at 116:7-9, Ex. 22; Pratt Decl. ¶¶ 64, 66, Ex. 15; Pl. Depo. Vol. I, 229:5-8.) | |
| | | Fact 55.  Plaintiff specifically admits that he is unaware of Bishop ever discussing Plaintiff's carpal tunnel or stretch breaks with Pratt.  (Jang Decl. ¶ 6, Ex. E, Pl.'s Response to Request for Admissions No. 8.) | |
| 4. | Plaintiff cannot establish his termination was pretextual based on his alleged conversation with Bishop in November 2017, during which Bishop allegedly said he did not "need this shit" because the evidence is not specific or substantial. | Fact 56.  Plaintiff admitted in his deposition that despite the initial off-the-cuff remark, he and Bishop proceeded to have a "good dialogue" about the issues Plaintiff hoped to raise, made a plan to address the issues, and scheduled and accepted a calendar invite for a few weeks later to reconvene with Plaintiff on the matter. (Pl. Depo., Vol. I, 129:15-20; Vol. II, 272:11-21.) | |
| | | Fact 57.  According to Plaintiff, he considered Bishop's plan to be sufficiently satisfactory that he did not believe it was necessary to raise his concerns to human resources.  (Pl. Depo., Vol. II, at 272:11-21.) | |
| | | Fact 58.  Bishop did not make the "I don't need this shit" comment in the context of any performance or termination discussion about Plaintiff.  (*See* (Pl. Depo., Vol. I, 129:15-20.) | |
| | | Fact 59.  Pratt, not Bishop, | |

| | | | |
|---|---|---|---|
| | | initiated Plaintiff's Documented Coaching Plan and termination. (Pratt Depo. at 116:7-9, Ex. 22; Pratt Decl. ¶ 64, Ex. 15; Pl. Depo. Vol. I, 229:5-8.) | |
| | | Fact 60. Bishop's role was limited in reviewing and approving Pratt's termination request for Plaintiff: Bishop reviewed the documents provided to him and agreed that Plaintiff failed to meet the expectations of the Documented Coaching Plan, most notably the expectation that Plaintiff process timecards properly. (Bishop Decl. ¶ 5.) | |
| | | Fact 61. To the extent Bishop agreed with the termination decision, Bishop specifically explained his reason for doing so: Plaintiff's performance issues caused employees to be underpaid and a trust gap existed as a result of Plaintiff's move-related misconduct. (Bishop Decl. ¶ 5.) | |
| | | Fact 62. Pratt had no knowledge of alleged meetings between Plaintiff and Bishop wherein Plaintiff alleges he discussed stretch breaks or potential OSHA violations. (Pratt Decl. ¶ 66.) | |
| | 5. Plaintiff cannot prove pretext for retaliation because Defendant initiated Plaintiff's Documented Coaching Plan and termination for legitimate, non-retaliatory reasons. | Fact 63. As early as April 2017, Pratt observed gaps in Plaintiff's performance. (Pratt Decl. ¶ 6; Pratt Depo. at 38:11-22.) | |
| | | Fact 64. Of specific concern to Pratt in 2017, it appeared Plaintiff was not conducting one-on-one coaching sessions with his direct reports, which was an essential part of Plaintiff's job duties as a Team Manager. (Pratt Decl. ¶ 7.) | |
| | | Fact 65. Pratt began coaching Plaintiff on performance deficiencies related to missed deadlines and workflow | |

11
DEFENDANT'S SEPARATE STATEMENT                               Case No. 5:19-CV-03034-EJD

| | | |
|---|---|---|
| | management as early as April 2017. (Pratt Decl. ¶ 14; Pratt Depo. at 26:3-5; 38:1-4.) | |
| | Fact 66. In 2015, Pratt previously coached Plaintiff on similar performance deficiencies by Plaintiff that Pratt also observed in 2017. (Pratt Decl. ¶ 11; Pl. Depo., Vol. I, Ex. 17.) | |
| | Fact 67. As documented in Plaintiff's 2015 Annual Performance Review, Pratt worked with Plaintiff on managing the workflow of the coaching sessions to ensure Plaintiff had sufficient time to complete them during the month. (*See* Pratt Decl. ¶ 12; Pratt Depo., Ex. 17 at JA043.) | |
| | Fact 68. In 2016, Plaintiff's then-manager, Sherry Gonzalez, noted in Plaintiff's coaching documentation similar deficiencies observed by Pratt in 2017. (Pratt Decl. ¶ 13; Pratt Depo., Ex. 42 at APL-AREBALO 109.) | |
| | Fact 69. Plaintiff's performance deficiencies were documented in his 2017 Annual Performance Review. (Pratt Depo., Ex. 19 at JA051.) | |
| | Fact 70. The 2017 Annual Performance Review listed specific, examples of Pratt's observations of Plaintiff failing to meet expectations. (Pratt Depo., Ex. 19 at JA051.) | |
| | Fact 71. At no point when Plaintiff received the 2017 Annual Performance Review from Pratt did Plaintiff dispute Pratt's feedback. (*See* Pl. Depo. Vol. I, Ex. 19 at JA053.) | |
| | Fact 72. Plaintiff wrote in his 2017 Annual Performance Review: "I agree completely here! I am looking forward to continuing to grow under your leadership, David." (Pl. Depo. Vol. I, Ex. 19 at JA053.) | |
| | Fact 73. When an employee receives an "expected more" rating in an annual | |

| | | |
|---|---|---|
| | performance review, the employee's manager is expected to provide direct coaching to the employee to improve their performance. (Pratt Decl. ¶ 27.) | |
| | Fact 74. On or around July 12, 2017, Pratt and Plaintiff met in a one-on-one meeting to discuss an "Action Plan" that identified ways to help Plaintiff address the observed performance issues by Pratt. (Pratt Decl. ¶ 28; Pl. Depo., Vol. I, at 173:23-174:4, Ex. 20.) | |
| | Fact 75. The Action Plan outlined the performance issues, including Plaintiff's continued failure to timely complete and upload his coaching session notes, and created a plan for addressing the issues. (Pratt Decl. ¶ 29; Pl. Depo., Vol. I, Ex. 20.) | |
| | Fact 76. The Action Plan focused particularly on Plaintiff's workflow management. (Pratt Decl. ¶ 30.) | |
| | Fact 77. The Action Plan therefore focused on ensuring Plaintiff allotted himself sufficient time to complete his core job duties without being interrupted by others. (Pratt Decl. ¶ 32; *see* Pl. Depo., Vol. I, Ex. 20 at APL-AREBALO 82.) | |
| | Fact 78. Despite the corrective guidance offered by his Action Plan, Pratt believed Plaintiff's performance remained inconsistent and uneven. (Pratt Decl. ¶ 47.) | |
| | Fact 79. As of August 2017, Plaintiff still had an issue with completing coaching sessions and reviewing his direct reports' timecards in a timely fashion. (Pratt Decl. ¶ 48, Ex. 11.) | |
| | Fact 80. After consulting with and obtaining approval from human resources, Pratt | |

| | | | |
|---|---|---|---|
| | | delivered a Documented Coaching Plan to Plaintiff on November 2, 2017. (Pratt Depo. at 116:7-9, Ex. 22.) | |
| | | Fact 81. The Documented Coaching Plan reiterated areas where Plaintiff's performance continued to fall short of expectations: completion of coaching sessions, timely review of customer survey responses, timely review of attendance, and workflow management. (Pratt Depo. Ex. 22 at APL-AREBALO 286). | |
| | | Fact 82. The Documented Coaching Plan required immediate, sustained performance improvement by Plaintiff over the period of one month, from November 3, 2017 to December 2, 2017; failure to make such improvement would be grounds for termination. (Pratt Decl. ¶ 51; Pratt Depo., Ex. 22 at APL-AREBALO 287.) | |
| | | Fact 83. During the Documented Coaching period, Plaintiff (1) missed a training deadline after a reminder; (2) failed to document a coaching session; (3) failed to conduct a coaching session; (4) reviewed timecards on the Friday and Saturday right before payroll ends; (5) failed to approve timecards timely, resulting in underpayment of employees; (6) failed to deliver a Misconduct Warning, which led to further misconduct; and (7) failed to review and address attendance issues with his direct reports. (*See* Pratt Depo., Ex 41 at APL-AREBALO-328.) | |
| | | Fact 84. Pratt testified that his reason for terminating Plaintiff's employment was based on Plaintiff's inability to satisfy the standards in the Documented Coaching Plan. (Pratt Decl. ¶ 64, Ex. 15; Pl. Depo. Vol. I, 229:5-8.) | |

| | | |
|---|---|---|
| | Fact 85.  Plaintiff's termination was a culmination of more than *seven months* of coaching, three months of which occurred *before* Plaintiff alleges that he first informed Pratt that he had carpal tunnel.  (Pratt Decl. ¶ 50; *see* Pl. Depo., Vol I, at 80:8-20.) | |
| **Claim 4 – Wrongful Termination in Violation of Public Policy under FEHA** | | |
| 1. Plaintiff cannot assert a claim for wrongful termination in violation of California public policy because the alleged wrongful termination did not occur in California and therefore, California law does not apply. | Fact 86.  Plaintiff worked and resided in Ocean Shores, Washington, at the time of his termination. (*See* Pl. Depo., Vol. I, at 21:7-18.) | |
| | Fact 87.  Pratt worked, resided, and made the decision to terminate Plaintiff's employment in Texas.  (Pratt Decl. ¶ 3; Pratt Depo., 9:1-2.) | |
| | Fact 88.  Bishop worked, resided, and approved Pratt's decision to terminate Plaintiff's employment in Washington. (Bishop Decl. ¶ 6.) | |

Dated:  February 1, 2021                                                   JACKSON LEWIS P.C.


                                                                By:   /s/ Scott P. Jang[1]
                                                                      Mitchell F. Boomer
                                                                      Scott P. Jang
                                                                      Yuki Cruse
                                                                      Attorneys for Defendant
                                                                      APPLE INC.

4820-4213-5256, v. 1

---

[1] Pursuant to the Court's Standing Order for Civil Cases, I attest that the evidence cited herein fairly and accurately supports or disputes the facts as asserted.